(Slip Opinion)　　　OCTOBER TERM, 2011　　　1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* JONES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 10–1259.　Argued November 8, 2011—Decided January 23, 2012

The Government obtained a search warrant permitting it to install a Global-Positioning-System (GPS) tracking device on a vehicle registered to respondent Jones's wife. The warrant authorized installation in the District of Columbia and within 10 days, but agents installed the device on the 11th day and in Maryland. The Government then tracked the vehicle's movements for 28 days. It subsequently secured an indictment of Jones and others on drug trafficking conspiracy charges. The District Court suppressed the GPS data obtained while the vehicle was parked at Jones's residence, but held the remaining data admissible because Jones had no reasonable expectation of privacy when the vehicle was on public streets. Jones was convicted. The D. C. Circuit reversed, concluding that admission of the evidence obtained by warrantless use of the GPS device violated the Fourth Amendment.

*Held:* The Government's attachment of the GPS device to the vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search under the Fourth Amendment. Pp. 3–12.

　　(a) The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Here, the Government's physical intrusion on an "effect" for the purpose of obtaining information constitutes a "search." This type of encroachment on an area enumerated in the Amendment would have been considered a search within the meaning of the Amendment at the time it was adopted. Pp. 3–4.

　　(b) This conclusion is consistent with this Court's Fourth Amendment jurisprudence, which until the latter half of the 20th century was tied to common-law trespass. Later cases, which have deviated from that exclusively property-based approach, have applied the

analysis of Justice Harlan's concurrence in *Katz* v. *United States*, 389 U. S. 347, which said that the Fourth Amendment protects a person's "reasonable expectation of privacy," *id.*, at 360. Here, the Court need not address the Government's contention that Jones had no "reasonable expectation of privacy," because Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation. At bottom, the Court must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo* v. *United States*, 533 U. S. 27, 34. *Katz* did not repudiate the understanding that the Fourth Amendment embodies a particular concern for government trespass upon the areas it enumerates. The *Katz* reasonable-expectation-of-privacy test has been added to, but not substituted for, the common-law trespassory test. See *Alderman* v. *United States*, 394 U. S. 165, 176; *Soldal* v. *Cook County*, 506 U. S. 56, 64. *United States* v. *Knotts*, 460 U. S. 276, and *United States* v. *Karo*, 468 U. S. 705—post-*Katz* cases rejecting Fourth Amendment challenges to "beepers," electronic tracking devices representing another form of electronic monitoring—do not foreclose the conclusion that a search occurred here. *New York* v. *Class*, 475 U. S. 106, and *Oliver* v. *United States*, 466 U. S. 170, also do not support the Government's position. Pp. 4–12.

   (c) The Government's alternative argument—that if the attachment and use of the device was a search, it was a reasonable one—is forfeited because it was not raised below. P. 12.

615 F. 3d 544, affirmed.

   SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and SOTOMAYOR, JJ., joined. SOTOMAYOR, J., filed a concurring opinion. ALITO, J., filed an opinion concurring in the judgment, in which GINSBURG, BREYER, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–1259

UNITED STATES, PETITIONER *v.* ANTOINE JONES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 23, 2012]

JUSTICE SCALIA delivered the opinion of the Court.

We decide whether the attachment of a Global-Positioning-System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the Fourth Amendment.

I

In 2004 respondent Antoine Jones, owner and operator of a nightclub in the District of Columbia, came under suspicion of trafficking in narcotics and was made the target of an investigation by a joint FBI and Metropolitan Police Department task force. Officers employed various investigative techniques, including visual surveillance of the nightclub, installation of a camera focused on the front door of the club, and a pen register and wiretap covering Jones's cellular phone.

Based in part on information gathered from these sources, in 2005 the Government applied to the United States District Court for the District of Columbia for a warrant authorizing the use of an electronic tracking device on the Jeep Grand Cherokee registered to Jones's

wife.  A warrant issued, authorizing installation of the de-
vice in the District of Columbia and within 10 days.

On the 11th day, and not in the District of Columbia but
in Maryland,[1] agents installed a GPS tracking device on
the undercarriage of the Jeep while it was parked in a
public parking lot.  Over the next 28 days, the Govern-
ment used the device to track the vehicle's movements,
and once had to replace the device's battery when the
vehicle was parked in a different public lot in Maryland.
By means of signals from multiple satellites, the device
established the vehicle's location within 50 to 100 feet, and
communicated that location by cellular phone to a Gov-
ernment computer.  It relayed more than 2,000 pages of
data over the 4-week period.

The Government ultimately obtained a multiple-count
indictment charging Jones and several alleged co-
conspirators with, as relevant here, conspiracy to distrib-
ute and possess with intent to distribute five kilograms or
more of cocaine and 50 grams or more of cocaine base, in
violation of 21 U. S. C. §§841 and 846.  Before trial, Jones
filed a motion to suppress evidence obtained through the
GPS device.  The District Court granted the motion only in
part, suppressing the data obtained while the vehicle was
parked in the garage adjoining Jones's residence.  451
F. Supp. 2d 71, 88 (2006).  It held the remaining data
admissible, because "'[a] person traveling in an automo-
bile on public thoroughfares has no reasonable expectation
of privacy in his movements from one place to another.'"
*Ibid.* (quoting *United States* v. *Knotts*, 460 U. S. 276, 281
(1983)).  Jones's trial in October 2006 produced a hung
jury on the conspiracy count.

In March 2007, a grand jury returned another indict-

---

[1] In this litigation, the Government has conceded noncompliance with
the warrant and has argued only that a warrant was not required.
*United States* v. *Maynard*, 615 F. 3d 544, 566, n. (CADC 2010).

ment, charging Jones and others with the same conspiracy. The Government introduced at trial the same GPS-derived locational data admitted in the first trial, which connected Jones to the alleged conspirators' stash house that contained $850,000 in cash, 97 kilograms of cocaine, and 1 kilogram of cocaine base. The jury returned a guilty verdict, and the District Court sentenced Jones to life imprisonment.

The United States Court of Appeals for the District of Columbia Circuit reversed the conviction because of admission of the evidence obtained by warrantless use of the GPS device which, it said, violated the Fourth Amendment. *United States* v. *Maynard*, 615 F. 3d 544 (2010). The D. C. Circuit denied the Government's petition for rehearing en banc, with four judges dissenting. 625 F. 3d 766 (2010). We granted certiorari, 564 U. S. \_\_\_ (2011).

## II

### A

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." It is beyond dispute that a vehicle is an "effect" as that term is used in the Amendment. *United States* v. *Chadwick*, 433 U. S. 1, 12 (1977). We hold that the Government's installation of a GPS device on a target's vehicle,[2] and its use of that device to monitor the vehicle's movements, constitutes a "search."

---

[2] As we have noted, the Jeep was registered to Jones's wife. The Government acknowledged, however, that Jones was "the exclusive driver." *Id.*, at 555, n. (internal quotation marks omitted). If Jones was not the owner he had at least the property rights of a bailee. The Court of Appeals concluded that the vehicle's registration did not affect his ability to make a Fourth Amendment objection, *ibid.*, and the Government has not challenged that determination here. We therefore do not consider the Fourth Amendment significance of Jones's status.

It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted. *Entick* v. *Carrington*, 95 Eng. Rep. 807 (C. P. 1765), is a "case we have described as a 'monument of English freedom' 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted, and considered to be 'the true and ultimate expression of constitutional law'" with regard to search and seizure. *Brower* v. *County of Inyo*, 489 U. S. 593, 596 (1989) (quoting *Boyd* v. *United States*, 116 U. S. 616, 626 (1886)). In that case, Lord Camden expressed in plain terms the significance of property rights in search-and-seizure analysis:

> "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law." *Entick, supra,* at 817.

The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.

Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. *Kyllo* v. *United States*, 533 U. S. 27, 31 (2001); Kerr, The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution, 102 Mich. L. Rev. 801, 816 (2004). Thus, in *Olmstead* v. *United States*, 277 U. S.

438 (1928), we held that wiretaps attached to telephone wires on the public streets did not constitute a Fourth Amendment search because "[t]here was no entry of the houses or offices of the defendants," *id.*, at 464.

Our later cases, of course, have deviated from that exclusively property-based approach. In *Katz* v. *United States*, 389 U. S. 347, 351 (1967), we said that "the Fourth Amendment protects people, not places," and found a violation in attachment of an eavesdropping device to a public telephone booth. Our later cases have applied the analysis of Justice Harlan's concurrence in that case, which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," *id.*, at 360. See, *e.g.*, *Bond* v. *United States*, 529 U. S. 334 (2000); *California* v. *Ciraolo*, 476 U. S. 207 (1986); *Smith* v. *Maryland*, 442 U. S. 735 (1979).

The Government contends that the Harlan standard shows that no search occurred here, since Jones had no "reasonable expectation of privacy" in the area of the Jeep accessed by Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all. But we need not address the Government's contentions, because Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo*, *supra*, at 34. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates.[3] *Katz* did not repudiate

_____

[3] JUSTICE ALITO's concurrence (hereinafter concurrence) doubts the wisdom of our approach because "it is almost impossible to think of late-18th-century situations that are analogous to what took place in this case." *Post*, at 3 (opinion concurring in judgment). But in fact it posits a situation that is not far afield—a constable's concealing himself

that understanding.  Less than two years later the Court
upheld defendants' contention that the Government could
not introduce against them conversations between *other*
people obtained by warrantless placement of electronic
surveillance devices in their homes.  The opinion rejected
the dissent's contention that there was no Fourth
Amendment violation "unless the conversational privacy of
the homeowner himself is invaded."[4]  *Alderman* v. *United
States*, 394 U. S. 165, 176 (1969).  "[W]e [do not] believe
that *Katz*, by holding that the Fourth Amendment protects
persons and their private conversations, was intended
to withdraw any of the protection which the Amendment
extends to the home . . . ."  *Id.*, at 180.

  More recently, in *Soldal* v. *Cook County*, 506 U. S. 56
(1992), the Court unanimously rejected the argument that
although a "seizure" had occurred "in a 'technical' sense"
when a trailer home was forcibly removed, *id.*, at 62, no
Fourth Amendment violation occurred because law en-
forcement had not "invade[d] the [individuals'] privacy,"
*id.*, at 60.  *Katz*, the Court explained, established that
"property rights are not the sole measure of Fourth

─────────────

in the target's coach in order to track its movements.  *Ibid.*  There is no
doubt that the information gained by that trespassory activity would be
the product of an unlawful search—whether that information consisted
of the conversations occurring in the coach, or of the destinations to
which the coach traveled.

  In any case, it is quite irrelevant whether there was an 18th-century
analog.  Whatever new methods of investigation may be devised, our
task, *at a minimum*, is to decide whether the action in question would
have constituted a "search" within the original meaning of the Fourth
Amendment.  Where, as here, the Government obtains information by
physically intruding on a constitutionally protected area, such a search
has undoubtedly occurred.

  [4] Thus, the concurrence's attempt to recast *Alderman* as meaning that
individuals have a "legitimate expectation of privacy in all conversa-
tions that [take] place under their roof," *post*, at 6–7, is foreclosed by
the Court's opinion.  The Court took as a given that the homeowner's
"conversational privacy" had not been violated.

Amendment violations," but did not "snuf[f] out the previously recognized protection for property." 506 U. S., at 64. As Justice Brennan explained in his concurrence in *Knotts*, *Katz* did not erode the principle "that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." 460 U. S., at 286 (opinion concurring in judgment). We have embodied that preservation of past rights in our very definition of "reasonable expectation of privacy" which we have said to be an expectation "that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota* v. *Carter*, 525 U. S. 83, 88 (1998) (internal quotation marks omitted). *Katz* did not narrow the Fourth Amendment's scope.[5]

The Government contends that several of our post-*Katz* cases foreclose the conclusion that what occurred here constituted a search. It relies principally on two cases in

—————

[5] The concurrence notes that post-*Katz* we have explained that "'an actual trespass is neither necessary *nor sufficient* to establish a constitutional violation.'" *Post*, at 6 (quoting *United States* v. *Karo*, 468 U. S. 705, 713 (1984)). That is undoubtedly true, and undoubtedly irrelevant. *Karo* was considering whether a seizure occurred, and as the concurrence explains, a seizure of property occurs, not when there is a trespass, but "when there is some meaningful interference with an individual's possessory interests in that property." *Post*, at 2 (internal quotation marks omitted). Likewise with a search. Trespass alone does not qualify, but there must be conjoined with that what was present here: an attempt to find something or to obtain information.

Related to this, and similarly irrelevant, is the concurrence's point that, if analyzed separately, neither the installation of the device nor its use would constitute a Fourth Amendment search. See *ibid*. Of course not. A trespass on "houses" or "effects," or a *Katz* invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy.

which we rejected Fourth Amendment challenges to "beepers," electronic tracking devices that represent another form of electronic monitoring. The first case, *Knotts*, upheld against Fourth Amendment challenge the use of a "beeper" that had been placed in a container of chloroform, allowing law enforcement to monitor the location of the container. 460 U. S., at 278. We said that there had been no infringement of Knotts' reasonable expectation of privacy since the information obtained—the location of the automobile carrying the container on public roads, and the location of the off-loaded container in open fields near Knotts' cabin—had been voluntarily conveyed to the public.[6] *Id.*, at 281–282. But as we have discussed, the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test. The holding in *Knotts* addressed only the former, since the latter was not at issue. The beeper had been placed in the container before it came into Knotts' possession, with the consent of the then-owner. 460 U. S., at 278. Knotts did not challenge that installation, and we specifically declined to consider its effect on the Fourth Amendment analysis. *Id.*, at 279, n. *Knotts* would be relevant, perhaps, if the Government were making the argument that what would otherwise be an unconstitutional search is not such where it produces only public information. The Government does not make that argument, and we know of no case that would support it.

The second "beeper" case, *United States* v. *Karo*, 468 U. S. 705 (1984), does not suggest a different conclusion. There we addressed the question left open by *Knotts*, whether the installation of a beeper in a container

—————

[6] *Knotts* noted the "limited use which the government made of the signals from this particular beeper," 460 U. S., at 284; and reserved the question whether "different constitutional principles may be applicable" to "dragnet-type law enforcement practices" of the type that GPS tracking made possible here, *ibid.*

amounted to a search or seizure. 468 U. S.*,* at 713. As in *Knotts*, at the time the beeper was installed the container belonged to a third party, and it did not come into possession of the defendant until later. 468 U. S., at 708. Thus, the specific question we considered was whether the installation *"with the consent of the original owner* constitute[d] a search or seizure . . . when the container is delivered to a buyer having no knowledge of the presence of the beeper." *Id.*, at 707 (emphasis added). We held not. The Government, we said, came into physical contact with the container only before it belonged to the defendant Karo; and the transfer of the container with the unmonitored beeper inside did not convey any information and thus did not invade Karo's privacy. See *id.*, at 712. That conclusion is perfectly consistent with the one we reach here. Karo accepted the container as it came to him, beeper and all, and was therefore not entitled to object to the beeper's presence, even though it was used to monitor the container's location. Cf. *On Lee* v. *United States*, 343 U. S. 747, 751–752 (1952) (no search or seizure where an informant, who was wearing a concealed microphone, was invited into the defendant's business). Jones, who possessed the Jeep at the time the Government trespassorily inserted the information-gathering device, is on much different footing.

The Government also points to our exposition in *New York* v. *Class*, 475 U. S. 106 (1986), that "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *Id.*, at 114. That statement is of marginal relevance here since, as the Government acknowledges, "the officers in this case did *more* than conduct a visual inspection of respondent's vehicle," Brief for United States 41 (emphasis added). By attaching the device to the Jeep, officers encroached on a protected area. In *Class* itself we suggested that this would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a

search.[7]  475 U. S., at 114–115.

Finally, the Government's position gains little support from our conclusion in *Oliver* v. *United States*, 466 U. S. 170 (1984), that officers' information-gathering intrusion on an "open field" did not constitute a Fourth Amendment search even though it was a trespass at common law, *id.*, at 183.  Quite simply, an open field, unlike the curtilage of a home, see *United States* v. *Dunn*, 480 U. S. 294, 300 (1987), is not one of those protected areas enumerated in the Fourth Amendment.  *Oliver, supra*, at 176–177.  See also *Hester* v. *United States*, 265 U. S. 57, 59 (1924).  The Government's physical intrusion on such an area—unlike its intrusion on the "effect" at issue here—is of no Fourth Amendment significance.[8]

## B

The concurrence begins by accusing us of applying "18th-century tort law."  *Post*, at 1.  That is a distortion. What we apply is an 18th-century guarantee against un-reasonable searches, which we believe must provide *at*

––––––––––

[7] The Government also points to *Cardwell* v. *Lewis*, 417 U. S. 583 (1974), in which the Court rejected the claim that the inspection of an impounded vehicle's tire tread and the collection of paint scrapings from its exterior violated the Fourth Amendment.  Whether the plurality said so because no search occurred or because the search was reasonable is unclear.  Compare *id.*, at 591 (opinion of Blackmun, J.) ("[W]e fail to comprehend what expectation of privacy was infringed"), with *id.*, at 592 ("Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable . . . ").

[8] Thus, our theory is *not* that the Fourth Amendment is concerned with "*any* technical trespass that led to the gathering of evidence." *Post*, at 3 (ALITO, J., concurring in judgment) (emphasis added).  The Fourth Amendment protects against trespassory searches only with regard to those items ("persons, houses, papers, and effects") that it enumerates.  The trespass that occurred in *Oliver* may properly be understood as a "search," but not one "in the constitutional sense."  466 U. S., at 170, 183.

*a minimum* the degree of protection it afforded when it was adopted. The concurrence does not share that belief. It would apply *exclusively Katz*'s reasonable-expectation-of-privacy test, even when that eliminates rights that previously existed.

The concurrence faults our approach for "present[ing] particularly vexing problems" in cases that do not involve physical contact, such as those that involve the transmission of electronic signals. *Post*, at 9. We entirely fail to understand that point. For unlike the concurrence, which would make *Katz* the *exclusive* test, we do not make trespass the exclusive test. Situations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis.

In fact, it is the concurrence's insistence on the exclusivity of the *Katz* test that needlessly leads us into "particularly vexing problems" in the present case. This Court has to date not deviated from the understanding that mere visual observation does not constitute a search. See *Kyllo*, 533 U. S., at 31–32. We accordingly held in *Knotts* that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U. S., at 281. Thus, even assuming that the concurrence is correct to say that "[t]raditional surveillance" of Jones for a 4-week period "would have required a large team of agents, multiple vehicles, and perhaps aerial assistance," *post*, at 12, our cases suggest that such visual observation is constitutionally permissible. It may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question.

And answering it affirmatively leads us needlessly into additional thorny problems. The concurrence posits that "relatively short-term monitoring of a person's movements

on public streets" is okay, but that "the use of longer term GPS monitoring in investigations *of most offenses*" is no good. *Post*, at 13 (emphasis added). That introduces yet another novelty into our jurisprudence. There is no precedent for the proposition that whether a search has occurred depends on the nature of the crime being investigated. And even accepting that novelty, it remains unexplained why a 4-week investigation is "surely" too long and why a drug-trafficking conspiracy involving substantial amounts of cash and narcotics is not an "extraordinary offens[e]" which may permit longer observation. See *post*, at 13–14. What of a 2-day monitoring of a suspected purveyor of stolen electronics? Or of a 6-month monitoring of a suspected terrorist? We may have to grapple with these "vexing problems" in some future case where a classic trespassory search is not involved and resort must be had to *Katz* analysis; but there is no reason for rushing forward to resolve them here.

## III

The Government argues in the alternative that even if the attachment and use of the device was a search, it was reasonable—and thus lawful—under the Fourth Amendment because "officers had reasonable suspicion, and indeed probable cause, to believe that [Jones] was a leader in a large-scale cocaine distribution conspiracy." Brief for United States 50–51. We have no occasion to consider this argument. The Government did not raise it below, and the D. C. Circuit therefore did not address it. See 625 F. 3d, at 767 (Ginsburg, Tatel, and Griffith, JJ., concurring in denial of rehearing en banc). We consider the argument forfeited. See *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 56, n. 4 (2002).

\*  \*  \*

The judgment of the Court of Appeals for the D. C. Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1259

_____

## UNITED STATES, PETITIONER *v.* ANTOINE JONES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 23, 2012]

JUSTICE SOTOMAYOR, concurring.

I join the Court's opinion because I agree that a search within the meaning of the Fourth Amendment occurs, at a minimum, "[w]here, as here, the Government obtains information by physically intruding on a constitutionally protected area." *Ante,* at 6, n. 3. In this case, the Government installed a Global Positioning System (GPS) tracking device on respondent Antoine Jones' Jeep without a valid warrant and without Jones' consent, then used that device to monitor the Jeep's movements over the course of four weeks. The Government usurped Jones' property for the purpose of conducting surveillance on him, thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection. See, *e.g., Silverman* v. *United States*, 365 U. S. 505, 511–512 (1961).

Of course, the Fourth Amendment is not concerned only with trespassory intrusions on property. See, *e.g., Kyllo* v. *United States*, 533 U. S. 27, 31–33 (2001). Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Id.,* at 33; see also *Smith* v. *Maryland*, 442 U. S. 735, 740–741 (1979); *Katz* v. *United States*, 389 U. S. 347, 361 (1967) (Harlan, J., concurring). In *Katz*, this Court enlarged its then-prevailing focus on property rights by announcing

that the reach of the Fourth Amendment does not "turn upon the presence or absence of a physical intrusion." *Id.,* at 353. As the majority's opinion makes clear, however, *Katz*'s reasonable-expectation-of-privacy test augmented, but did not displace or diminish, the common-law trespassory test that preceded it. *Ante,* at 8. Thus, "when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *United States* v. *Knotts*, 460 U. S. 276, 286 (1983) (Brennan, J., concurring in judgment); see also, *e.g., Rakas* v. *Illinois*, 439 U. S. 128, 144, n. 12 (1978). JUSTICE ALITO's approach, which discounts altogether the constitutional relevance of the Government's physical intrusion on Jones' Jeep, erodes that longstanding protection for privacy expectations inherent in items of property that people possess or control. See *post,* at 5–7 (opinion concurring in judgment). By contrast, the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs. The reaffirmation of that principle suffices to decide this case.

Nonetheless, as JUSTICE ALITO notes, physical intrusion is now unnecessary to many forms of surveillance. *Post,* at 9–12. With increasing regularity, the Government will be capable of duplicating the monitoring undertaken in this case by enlisting factory- or owner-installed vehicle tracking devices or GPS-enabled smartphones. See *United States* v. *Pineda-Moreno*, 617 F. 3d 1120, 1125 (CA9 2010) (Kozinski, C. J., dissenting from denial of rehearing en banc). In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance. But "[s]ituations involving merely the transmission of electronic signals without trespass

would *remain* subject to *Katz* analysis." *Ante,* at 11. As
JUSTICE ALITO incisively observes, the same technological
advances that have made possible nontrespassory surveil-
lance techniques will also affect the *Katz* test by shaping
the evolution of societal privacy expectations. *Post,* at
10–11. Under that rubric, I agree with JUSTICE ALITO that,
at the very least, "longer term GPS monitoring in inves-
tigations of most offenses impinges on expectations of
privacy." *Post,* at 13.

In cases involving even short-term monitoring, some
unique attributes of GPS surveillance relevant to the *Katz*
analysis will require particular attention. GPS monitoring
generates a precise, comprehensive record of a person's
public movements that reflects a wealth of detail about
her familial, political, professional, religious, and sexual
associations. See, *e.g., People* v. *Weaver*, 12 N. Y. 3d 433,
441–442, 909 N. E. 2d 1195, 1199 (2009) ("Disclosed in
[GPS] data . . . will be trips the indisputably private na-
ture of which takes little imagination to conjure: trips
to the psychiatrist, the plastic surgeon, the abortion clinic,
the AIDS treatment center, the strip club, the criminal
defense attorney, the by-the-hour motel, the union meet-
ing, the mosque, synagogue or church, the gay bar and
on and on"). The Government can store such records
and efficiently mine them for information years into the
future. *Pineda-Moreno*, 617 F. 3d, at 1124 (opinion of
Kozinski, C. J.). And because GPS monitoring is cheap
in comparison to conventional surveillance techniques and,
by design, proceeds surreptitiously, it evades the ordinary
checks that constrain abusive law enforcement practices:
"limited police resources and community hostility." *Illi-
nois* v. *Lidster*, 540 U. S. 419, 426 (2004).

Awareness that the Government may be watching chills
associational and expressive freedoms. And the Govern-
ment's unrestrained power to assemble data that reveal
private aspects of identity is susceptible to abuse. The net

result is that GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track—may "alter the relationship between citizen and government in a way that is inimical to democratic society." *United States* v. *Cuevas-Perez*, 640 F. 3d 272, 285 (CA7 2011) (Flaum, J., concurring).

I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements. I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on. I do not regard as dispositive the fact that the Government might obtain the fruits of GPS monitoring through lawful conventional surveillance techniques. See *Kyllo*, 533 U. S., at 35, n. 2; *ante,* at 11 (leaving open the possibility that duplicating traditional surveillance "through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy"). I would also consider the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power to and prevent "a too permeating police surveillance," *United States* v. *Di Re*, 332 U. S. 581, 595 (1948).*

—————

*\* United States* v. *Knotts*, 460 U. S. 276 (1983), does not foreclose the conclusion that GPS monitoring, in the absence of a physical intrusion, is a Fourth Amendment search. As the majority's opinion notes, *Knotts* reserved the question whether "'different constitutional principles may be applicable'" to invasive law enforcement practices such as GPS tracking. See *ante,* at 8, n. 6 (quoting 460 U. S., at 284).

*United States* v. *Karo*, 468 U. S. 705 (1984), addressed the Fourth

More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. *E.g., Smith*, 442 U. S., at 742; *United States* v. *Miller*, 425 U. S. 435, 443 (1976). This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Perhaps, as JUSTICE ALITO notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," *post,* at 10, and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases

––––––––––

Amendment implications of the installation of a beeper in a container with the consent of the container's original owner, who was aware that the beeper would be used for surveillance purposes. *Id.,* at 707. Owners of GPS-equipped cars and smartphones do not contemplate that these devices will be used to enable covert surveillance of their movements. To the contrary, subscribers of one such service greeted a similar suggestion with anger. Quain, Changes to OnStar's Privacy Terms Rile Some Users, N. Y. Times (Sept. 22, 2011), online at http://wheels.blogs.nytimes.com/2011/09/22/changes-to-onstars-privacy-terms-rile-some-users (as visited Jan. 19, 2012, and available in Clerk of Court's case file). In addition, the bugged container in *Karo* lacked the close relationship with the target that a car shares with its owner. The bugged container in *Karo* was stationary for much of the Government's surveillance. See 468 U. S., at 708–710. A car's movements, by contrast, are its owner's movements.

to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection. See *Smith*, 442 U. S., at 749 (Marshall, J., dissenting) ("Privacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a bank or phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes"); see also *Katz*, 389 U. S., at 351–352 ("[W]hat [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected").

Resolution of these difficult questions in this case is unnecessary, however, because the Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision. I therefore join the majority's opinion.

# SUPREME COURT OF THE UNITED STATES

————————

No. 10–1259

————————

## UNITED STATES, PETITIONER *v.* ANTOINE JONES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 23, 2012]

JUSTICE ALITO, with whom JUSTICE GINSBURG, JUSTICE
BREYER, and JUSTICE KAGAN join, concurring in the
judgment.

This case requires us to apply the Fourth Amendment's
prohibition of unreasonable searches and seizures to a
21st-century surveillance technique, the use of a Global Po-
sitioning System (GPS) device to monitor a vehicle's move-
ments for an extended period of time. Ironically, the Court
has chosen to decide this case based on 18th-century
tort law. By attaching a small GPS device[1] to the under-
side of the vehicle that respondent drove, the law enforce-
ment officers in this case engaged in conduct that might
have provided grounds in 1791 for a suit for trespass
to chattels.[2] And for this reason, the Court concludes,
the installation and use of the GPS device constituted
a search. *Ante*, at 3–4.

————————

[1] Although the record does not reveal the size or weight of the device
used in this case, there is now a device in use that weighs two ounces
and is the size of a credit card. Tr. of Oral Arg. 27.

[2] At common law, a suit for trespass to chattels could be maintained if
there was a violation of "the dignitary interest in the inviolability of
chattels," but today there must be "some actual damage to the chattel
before the action can be maintained." W. Keeton, D. Dobbs, R. Keeton,
& D. Owen, Prosser & Keeton on Law of Torts 87 (5th ed. 1984) (here-
inafter Prosser & Keeton). Here, there was no actual damage to the
vehicle to which the GPS device was attached.

This holding, in my judgment, is unwise. It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.

I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

## I
## A

The Fourth Amendment prohibits "unreasonable searches and seizures," and the Court makes very little effort to explain how the attachment or use of the GPS device fits within these terms. The Court does not contend that there was a seizure. A seizure of property occurs when there is "some meaningful interference with an individual's possessory interests in that property," *United States* v. *Jacobsen,* 466 U. S. 109, 113 (1984), and here there was none. Indeed, the success of the surveillance technique that the officers employed was dependent on the fact that the GPS did not interfere in any way with the operation of the vehicle, for if any such interference had been detected, the device might have been discovered.

The Court does claim that the installation and use of the GPS constituted a search, see *ante,* at 3–4, but this conclusion is dependent on the questionable proposition that these two procedures cannot be separated for purposes of Fourth Amendment analysis. If these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search. It is clear that the attachment of the GPS device was not itself a search; if the device had not functioned or if the officers had not used it, no information would have been obtained. And the Court does not contend that the use of the device constituted a search either. On the contrary, the Court

accepts the holding in *United States* v. *Knotts*, 460 U. S. 276 (1983), that the use of a surreptitiously planted electronic device to monitor a vehicle's movements on public roads did not amount to a search. See *ante*, at 7.

The Court argues—and I agree—that "we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Ante*, at 5 (quoting *Kyllo* v. *United States*, 533 U. S. 27, 34 (2001)). But it is almost impossible to think of late-18th-century situations that are analogous to what took place in this case. (Is it possible to imagine a case in which a constable secreted himself somewhere in a coach and remained there for a period of time in order to monitor the movements of the coach's owner?[3]) The Court's theory seems to be that the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence, but we know that this is incorrect. At common law, any unauthorized intrusion on private property was actionable, see Prosser & Keeton 75, but a trespass on open fields, as opposed to the "curtilage" of a home, does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a "hous[e]" within the meaning of the Fourth Amendment. See *Oliver* v. *United State*s, 466 U. S. 170 (1984); *Hester* v. *United States*, 265 U. S. 57 (1924).

B

The Court's reasoning in this case is very similar to that in the Court's early decisions involving wiretapping and electronic eavesdropping, namely, that a technical trespass followed by the gathering of evidence constitutes a

—————

[3] The Court suggests that something like this might have occurred in 1791, but this would have required either a gigantic coach, a very tiny constable, or both—not to mention a constable with incredible fortitude and patience.

search. In the early electronic surveillance cases, the Court concluded that a Fourth Amendment search occurred when private conversations were monitored as a result of an "unauthorized physical penetration into the premises occupied" by the defendant. *Silverman* v. *United States*, 365 U. S. 505, 509 (1961). In *Silverman*, police officers listened to conversations in an attached home by inserting a "spike mike" through the wall that this house shared with the vacant house next door. *Id.,* at 506. This procedure was held to be a search because the mike made contact with a heating duct on the other side of the wall and thus "usurp[ed] . . . an integral part of the premises." *Id.,* at 511.

By contrast, in cases in which there was no trespass, it was held that there was no search. Thus, in *Olmstead* v. *United States*, 277 U. S. 438 (1928), the Court found that the Fourth Amendment did not apply because "[t]he taps from house lines were made in the streets near the houses." *Id.*, at 457. Similarly, the Court concluded that no search occurred in *Goldman* v. *United States*, 316 U. S. 129, 135 (1942), where a "detectaphone" was placed on the outer wall of defendant's office for the purpose of overhearing conversations held within the room.

This trespass-based rule was repeatedly criticized. In *Olmstead*, Justice Brandeis wrote that it was "immaterial where the physical connection with the telephone wires was made." 277 U. S., at 479 (dissenting opinion). Although a private conversation transmitted by wire did not fall within the literal words of the Fourth Amendment, he argued, the Amendment should be understood as prohibiting "every unjustifiable intrusion by the government upon the privacy of the individual." *Id.,* at 478. See also, *e.g.*, *Silverman*, *supra*, at 513 (Douglas, J., concurring) ("The concept of 'an unauthorized physical penetration into the premises,' on which the present decision rests seems to me beside the point. Was not the wrong . . . done when the

intimacies of the home were tapped, recorded, or revealed? The depth of the penetration of the electronic device—even the degree of its remoteness from the inside of the house— is not the measure of the injury"); *Goldman*, *supra*, at 139 (Murphy, J., dissenting) ("[T]he search of one's home or office no longer requires physical entry, for science has brought forth far more effective devices for the invasion of a person's privacy than the direct and obvious methods of oppression which were detested by our forebears and which inspired the Fourth Amendment").

*Katz* v. *United States*, 389 U. S. 347 (1967), finally did away with the old approach, holding that a trespass was not required for a Fourth Amendment violation. *Katz* involved the use of a listening device that was attached to the outside of a public telephone booth and that allowed police officers to eavesdrop on one end of the target's phone conversation. This procedure did not physically intrude on the area occupied by the target, but the *Katz* Court "repudiate[ed]" the old doctrine, *Rakas* v. *Illinois*, 439 U. S. 128, 143 (1978), and held that "[t]he fact that the electronic device employed . . . did not happen to penetrate the wall of the booth can have no constitutional significance," 389 U. S., at 353 ("[T]he reach of th[e] [Fourth] Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure"); see *Rakas*, *supra*, at 143 (describing *Katz* as holding that the "capacity to claim the protection for the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"); *Kyllo, supra,* at 32 ("We have since decoupled violation of a person's Fourth Amendment rights from trespassory violation of his property"). What mattered, the Court now held, was whether the conduct at issue "violated the privacy upon which [the defendant] justifiably relied while using the telephone booth." *Katz, supra*,

at 353.

Under this approach, as the Court later put it when addressing the relevance of a technical trespass, "an actual trespass is neither necessary *nor sufficient* to establish a constitutional violation." *United States* v. *Karo,* 468 U. S. 705, 713 (1984) (emphasis added). *Ibid.* ("Compar[ing] *Katz* v. *United States*, 389 U. S. 347 (1967) (no trespass, but Fourth Amendment violation), with *Oliver* v. *United States*, 466 U. S. 170 (1984) (trespass, but no Fourth Amendment violation)"). In *Oliver,* the Court wrote:

> "The existence of a property right is but one element in determining whether expectations of privacy are legitimate. 'The premise that property interests control the right of the Government to search and seize has been discredited.' *Katz*, 389 U. S., at 353, (quoting *Warden* v. *Hayden*, 387 U. S. 294, 304 (1967); some internal quotation marks omitted)." 466 U. S., at 183.

## II

The majority suggests that two post-*Katz* decisions— *Soldal* v. *Cook County*, 506 U. S. 56 (1992), and *Alderman* v. *United States*, 394 U. S. 165 (1969)—show that a technical trespass is sufficient to establish the existence of a search, but they provide little support.

In *Soldal*, the Court held that towing away a trailer home without the owner's consent constituted a seizure even if this did not invade the occupants' personal privacy. But in the present case, the Court does not find that there was a seizure, and it is clear that none occurred.

In *Alderman,* the Court held that the Fourth Amendment rights of homeowners were implicated by the use of a surreptitiously planted listening device to monitor thirdparty conversations that occurred within their home. See 394 U. S., at 176–180. *Alderman* is best understood to

mean that the homeowners had a legitimate expectation of privacy in all conversations that took place under their roof. See *Rakas*, 439 U. S., at 144, n. 12 (citing *Alderman* for the proposition that "the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment"); 439 U. S., at 153 (Powell, J., concurring) (citing *Alderman* for the proposition that "property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual's expectations of privacy are reasonable); *Karo*, *supra*, at 732 (Stevens, J., concurring in part and dissenting in part) (citing *Alderman* in support of the proposition that "a homeowner has a reasonable expectation of privacy in the contents of his home, including items owned by others").

In sum, the majority is hard pressed to find support in post-*Katz* cases for its trespass-based theory.

## III

Disharmony with a substantial body of existing case law is only one of the problems with the Court's approach in this case.

I will briefly note four others. First, the Court's reasoning largely disregards what is really important (the *use* of a GPS for the purpose of long-term tracking) and instead attaches great significance to something that most would view as relatively minor (attaching to the bottom of a car a small, light object that does not interfere in any way with the car's operation). Attaching such an object is generally regarded as so trivial that it does not provide a basis for recovery under modern tort law. See Prosser & Keeton §14, at 87 (harmless or trivial contact with personal property not actionable); D. Dobbs, Law of Torts 124 (2000) (same). But under the Court's reasoning, this conduct

may violate the Fourth Amendment. By contrast, if long-term monitoring can be accomplished without committing a technical trespass—suppose, for example, that the Federal Government required or persuaded auto manufacturers to include a GPS tracking device in every car—the Court's theory would provide no protection.

Second, the Court's approach leads to incongruous results. If the police attach a GPS device to a car and use the device to follow the car for even a brief time, under the Court's theory, the Fourth Amendment applies. But if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints.

In the present case, the Fourth Amendment applies, the Court concludes, because the officers installed the GPS device after respondent's wife, to whom the car was registered, turned it over to respondent for his exclusive use. See *ante*, at 8. But if the GPS had been attached prior to that time, the Court's theory would lead to a different result. The Court proceeds on the assumption that respondent "had at least the property rights of a bailee," *ante*, at 3, n. 2, but a bailee may sue for a trespass to chattel only if the injury occurs during the term of the bailment. See 8A Am. Jur. 2d, Bailment §166, pp. 685–686 (2009). So if the GPS device had been installed before respondent's wife gave him the keys, respondent would have no claim for trespass—and, presumably, no Fourth Amendment claim either.

Third, under the Court's theory, the coverage of the Fourth Amendment may vary from State to State. If the events at issue here had occurred in a community property State[4] or a State that has adopted the Uniform Marital

---

[4] See, *e.g.*, Cal. Family Code Ann. §760 (West 2004).

Property Act,[5] respondent would likely be an owner of the vehicle, and it would not matter whether the GPS was installed before or after his wife turned over the keys. In non-community-property States, on the other hand, the registration of the vehicle in the name of respondent's wife would generally be regarded as presumptive evidence that she was the sole owner. See 60 C. J. S., Motor Vehicles §231, pp. 398–399 (2002); 8 Am. Jur. 2d, Automobiles §1208, pp. 859–860 (2007).

Fourth, the Court's reliance on the law of trespass will present particularly vexing problems in cases involving surveillance that is carried out by making electronic, as opposed to physical, contact with the item to be tracked. For example, suppose that the officers in the present case had followed respondent by surreptitiously activating a stolen vehicle detection system that came with the car when it was purchased. Would the sending of a radio signal to activate this system constitute a trespass to chattels? Trespass to chattels has traditionally required a physical touching of the property. See Restatement (Second) of Torts §217 and Comment *e* (1963 and 1964); Dobbs, *supra*, at 123. In recent years, courts have wrestled with the application of this old tort in cases involving unwanted electronic contact with computer systems, and some have held that even the transmission of electrons that occurs when a communication is sent from one computer to another is enough. See, *e.g., CompuServe, Inc.* v. *Cyber Promotions, Inc.* 962 F. Supp. 1015, 1021 (SD Ohio 1997); *Thrifty-Tel, Inc.* v. *Bezenek*, 46 Cal. App. 4th 1559, 1566, n. 6 (1996). But may such decisions be followed in applying the Court's trespass theory? Assuming that what matters under the Court's theory is the law of trespass as it existed at the time of the adoption of the Fourth

---

[5] See Uniform Marital Property Act §4, 9A U. L. A. 116 (1998).

Amendment, do these recent decisions represent a change in the law or simply the application of the old tort to new situations?

## IV
## A

The *Katz* expectation-of-privacy test avoids the problems and complications noted above, but it is not without its own difficulties. It involves a degree of circularity, see *Kyllo*, 533 U. S., at 34, and judges are apt to confuse their own expectations of privacy with those of the hypothetical reasonable person to which the *Katz* test looks. See *Minnesota* v. *Carter*, 525 U. S. 83, 97 (1998) (SCALIA, J., concurring). In addition, the *Katz* test rests on the assumption that this hypothetical reasonable person has a well-developed and stable set of privacy expectations. But technology can change those expectations. Dramatic technological change may lead to periods in which popular expectations are in flux and may ultimately produce significant changes in popular attitudes. New technology may provide increased convenience or security at the expense of privacy, and many people may find the tradeoff worthwhile. And even if the public does not welcome the diminution of privacy that new technology entails, they may eventually reconcile themselves to this development as inevitable.[6]

On the other hand, concern about new intrusions on privacy may spur the enactment of legislation to protect against these intrusions. This is what ultimately happened with respect to wiretapping. After *Katz*, Congress

---

[6] See, *e.g.*, NPR, The End of Privacy http://www.npr.org/series/114250076/the-end-of-privacy (all Internet materials as visited Jan. 20, 2012, and available in Clerk of Court's case file); Time Magazine, Everything About You Is Being Tracked—Get Over It, Joel Stein, Mar. 21, 2011, Vol. 177, No. 11.

did not leave it to the courts to develop a body of Fourth Amendment case law governing that complex subject. Instead, Congress promptly enacted a comprehensive statute, see 18 U. S. C. §§2510–2522 (2006 ed. and Supp. IV), and since that time, the regulation of wiretapping has been governed primarily by statute and not by case law.[7] In an ironic sense, although *Katz* overruled *Olmstead*, Chief Justice Taft's suggestion in the latter case that the regulation of wiretapping was a matter better left for Congress, see 277 U. S., at 465–466, has been borne out.

### B

Recent years have seen the emergence of many new devices that permit the monitoring of a person's movements. In some locales, closed-circuit television video monitoring is becoming ubiquitous. On toll roads, automatic toll collection systems create a precise record of the movements of motorists who choose to make use of that convenience. Many motorists purchase cars that are equipped with devices that permit a central station to ascertain the car's location at any time so that roadside assistance may be provided if needed and the car may be found if it is stolen.

Perhaps most significant, cell phones and other wireless devices now permit wireless carriers to track and record the location of users—and as of June 2011, it has been reported, there were more than 322 million wireless devices in use in the United States.[8] For older phones, the accuracy of the location information depends on the density of the tower network, but new "smart phones," which

---

[7] See Kerr, The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution, 102 Mich. L. Rev. 801, 850–851 (2004) (hereinafter Kerr).

[8] See CTIA Consumer Info, 50 Wireless Quick Facts, http://www.ctia.org/consumer_info/index.cfm/AID/10323.

are equipped with a GPS device, permit more precise tracking. For example, when a user activates the GPS on such a phone, a provider is able to monitor the phone's location and speed of movement and can then report back real-time traffic conditions after combining ("crowdsourcing") the speed of all such phones on any particular road.[9] Similarly, phone-location-tracking services are offered as "social" tools, allowing consumers to find (or to avoid) others who enroll in these services. The availability and use of these and other new devices will continue to shape the average person's expectations about the privacy of his or her daily movements.

## V

In the pre-computer age, the greatest protections of privacy were neither constitutional nor statutory, but practical. Traditional surveillance for any extended period of time was difficult and costly and therefore rarely undertaken. The surveillance at issue in this case—constant monitoring of the location of a vehicle for four weeks— would have required a large team of agents, multiple vehicles, and perhaps aerial assistance.[10] Only an investigation of unusual importance could have justified such an

---

[9] See, *e.g.*, The bright side of sitting in traffic: Crowdsourcing road congestion data, Google Blog, http://googleblog.blogspot.com/2009/08/bright-side-of-sitting-in-traffic.html.

[10] Even with a radio transmitter like those used in *United States* v. *Knotts*, 460 U. S. 276 (1983), or *United States* v. *Karo,* 468 U. S. 705 (1984), such long-term surveillance would have been exceptionally demanding. The beepers used in those cases merely "emit[ted] periodic signals that [could] be picked up by a radio receiver." *Knotts*, 460 U.S., at 277. The signal had a limited range and could be lost if the police did not stay close enough. Indeed, in *Knotts* itself, officers lost the signal from the beeper, and only "with the assistance of a monitoring device located in a helicopter [was] the approximate location of the signal . . . picked up again about one hour later." *Id*., at 278.

expenditure of law enforcement resources. Devices like the one used in the present case, however, make long-term monitoring relatively easy and cheap. In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative. See, *e.g.*, Kerr, 102 Mich. L. Rev., at 805–806. A legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way.

To date, however, Congress and most States have not enacted statutes regulating the use of GPS tracking technology for law enforcement purposes. The best that we can do in this case is to apply existing Fourth Amendment doctrine and to ask whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated.

Under this approach, relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. See *Knotts,* 460 U. S., at 281–282. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period. In this case, for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving. We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark. Other cases may present more difficult questions. But where uncertainty exists with respect to whether a certain period of GPS surveil

lance is long enough to constitute a Fourth Amendment search, the police may always seek a warrant.[11] We also need not consider whether prolonged GPS monitoring in the context of investigations involving extraordinary offenses would similarly intrude on a constitutionally protected sphere of privacy. In such cases, long-term tracking might have been mounted using previously available techniques.

\* \* \*

For these reasons, I conclude that the lengthy monitoring that occurred in this case constituted a search under the Fourth Amendment. I therefore agree with the majority that the decision of the Court of Appeals must be affirmed.

––––––––––

[11] In this case, the agents obtained a warrant, but they did not comply with two of the warrant's restrictions: They did not install the GPS device within the 10-day period required by the terms of the warrant and by Fed. Rule Crim. Proc. 41(e)(2)(B)(i), and they did not install the GPS device within the District of Columbia, as required by the terms of the warrant and by 18 U. S. C. §3117(a) and Rule 41(b)(4). In the courts below the Government did not argue, and has not argued here, that the Fourth Amendment does not impose these precise restrictions and that the violation of these restrictions does not demand the suppression of evidence obtained using the tracking device. See, *e.g.*, *United States* v. *Gerber*, 994 F. 2d 1556, 1559–1560 (CA11 1993); *United States* v. *Burke*, 517 F. 2d 377, 386–387 (CA2 1975). Because it was not raised, that question is not before us.