FILED
United States Court of Appeals
Tenth Circuit

April 5, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RUBEN CANTU,

Defendant - Appellant.

No. 16-2191
(D.C. No. 5:14-CR-02114-RB-1)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, Chief Judge, **HOLMES**, and **PHILLIPS**, Circuit Judges.

Ruben Cantu appeals the district court's denial of his motion to suppress evidence seized as the result of surveillance by a camera placed without a warrant on a utility pole near his residence. After the district court denied his motion to suppress, Cantu pleaded guilty to being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g), reserving the right to appeal the district court's order. The only issue before us in this appeal is whether the district court erred in denying Cantu's motion to suppress.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

We affirm because we can find no error in the district court analysis.  The district court correctly followed our decision in *United States v. Jackson*, 213 F.3d 1269, 1280 (10th Cir.), *judgment vacated on other grounds*, 531 U.S. 1033 (2000), which involved similar facts, as well as the relevant Supreme Court precedent.

## I.  Background

The arrest in this case arose from an investigation by the Lea County Drug Task Force and the FBI of a drug-trafficking organization operating in Hobbs, New Mexico.  One of the subjects of their investigation was Rolando Cantu, the defendant's brother and also his next-door neighbor.  At the request of the Task Force, the local utility company installed a video camera on a utility pole approximately 70 yards from the brothers' adjacent residences.  This was the closest utility pole to the properties.  The pole was on the side of a paved alley providing access to a parking lot and commercial buildings.  The camera allowed agents to observe the front of the brothers' properties, as well as a common, unpaved area between Rolando Cantu's house and the defendant's trailer.  The camera did not record sound, and it did not allow the agents to see inside either property.  It provided a continuous live feed to a television screen at the Task Force office.  Agents at the Task Force office could adjust the camera, zoom it in and out, and take still photographs.  Although they are uncertain precisely when it

was removed, the Task Force was using the camera at another address a few months after the surveillance of the Cantus's properties.

During the course of this surveillance, the Task Force's commander saw someone on the video feed walking in the common area between the two residences, carrying what looked like an assault rifle. The commander captured several still photographs from the feed. It is apparent from these photographs that a car or pedestrian coming down the street would have seen the man carrying the weapon. *See* Attachments to Aple. Br. The Task Force agents knew from New Mexico Probation and Parole that Ruben Cantu, the defendant, lived in the residence next to Rolando Cantu. The agents compared a photograph of Ruben Cantu with the still photographs from the video camera, which allowed them to identify the man carrying the assault rifle as Ruben Cantu. After reviewing his criminal history and seeing a prior felony conviction, the Task Force obtained a search warrant for Ruben Cantu's property. The agents found an AR-15 assault rifle and over 100 rounds of ammunition.

## II. Analysis

The parties have stipulated all relevant facts, so we review only the district court's legal analysis. We review questions of law de novo, including the "ultimate determination of reasonableness under the Fourth Amendment." *United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) (quoting *United States v. Polly*, 630 F.3d 991, 996 (10th Cir. 2011)).

Our analysis could begin and end with *United States v. Jackson*, 213 F.3d 1269 (10th Cir.), *judgment vacated on other grounds*, 531 U.S. 1033 (2000). The facts in *Jackson* were quite similar. Law enforcement had "installed video cameras on the tops of telephone poles overlooking the residences of" the suspected leaders of drug organizations. *Id.* at 1276. "[B]oth of these cameras could be adjusted by officers at the police station, and could zoom in close enough to read a license plate, [but] neither had the capacity to record sound, and neither could view the inside of the houses." *Id.*

On appeal, the subject of the surveillance argued the pole cameras violated her Fourth Amendment rights because they were installed without a warrant. *Id.* at 1280. We disagreed, holding that "[t]he use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment." *Id.* at 1280-1281 (citing *Dow Chem. Co. v. United States*, 476 U.S. 227 (1986); *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). Not only that, but "activity a person knowingly exposes to the public is not a subject of Fourth Amendment protection, and thus, is not constitutionally protected from observation." *Id.* at 1281 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). Pointing to two facts—(1) the pole cameras could not see inside the houses and (2) the pole cameras could only see what a passerby could observe—we found the subject of the surveillance "had no reasonable expectation of privacy that was intruded upon by the video cameras." *Id.* The surveillance

therefore did not violate the Fourth Amendment, and the police officers did not need to obtain a warrant to install or use the pole camera. *Id.*

Cantu attempts to distinguish his case from *Jackson*. He points out that the pole camera evidence in *Jackson* was used against the subject of the investigation, whereas he "simply unknowingly walked into the path" of the pole camera. Aplt. Br. at 25. But this is a distinction without legal significance. Our holding in *Jackson* was not premised on the fact that the evidence was used against the subject of the investigation. Here, agents saw a man walk from a suspected drug trafficker's residence to a neighboring house carrying a large assault rifle. "Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes." *Ciraolo*, 476 U.S. at 213. And it has never been extended to prevent them from acting when in the course of their investigation they see someone other than their target committing a likely criminal act.

Cantu also argues that *Florida v. Jardines*, 133 S. Ct. 1409 (2013), a Supreme Court case decided after *Jackson*, casts *Jackson*'s holding into doubt. We disagree. Cantu's argument confuses the two different tests articulated in the Fourth Amendment jurisprudence: the reasonable-expectation-of-privacy test and the common-law trespassory test. The Supreme Court clarified in *United States v. Jones*, 565 U.S. 400, 405-08 (2012), that an unconstitutional search can be established under either standard. As Cantu himself notes, the "reasonable-

expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." Aplt. Br. at 13 (quoting *Jones*, 565 U.S. at 409). *Jardines*, unlike here, involved a "physical intrusion of a constitutionally protected area." 133 S. Ct. at 1414 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring)). The police in *Jardines* "gather[ed] information in an area belonging to [the suspect] and immediately surrounding his house . . . by physically entering and occupying the area." *Id.* at 1414. By contrast, Cantu's motion to suppress must be assessed under the reasonable-expectation-of-privacy test, since he does not allege any physical intrusion occurred. *Jardines* has no bearing on *Jackson* or on Cantu's appeal.

Cantu also tries to avoid *Jackson*'s application by arguing that the common area in which he was carrying the assault rifle was his curtilage and thus a protected area under the Fourth Amendment. Even assuming for the sake of argument that it was curtilage, the surveillance did not violate Cantu's constitutional rights. "That [an] area is within the curtilage does not itself bar all police observation." *Ciraolo*, 476 U.S. at 213. The question is still whether society is willing to recognize Cantu's expectation of privacy as reasonable. *See, e.g.*, *Smith v. Maryland*, 442 U.S. 735, 740 (1979). And *Jackson* stands for the proposition that it is not. 213 F.3d at 1281.

He further argues that the surveillance failed to comply with our precedent in *United States v. Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990) (delineating requirements for domestic video surveillance). But that case is not on point: *Mesa-*

*Rincon* involved the installation of a video camera *inside* a business, a place where there was a reasonable expectation of privacy. Its requirements do not pertain to surveillance of places where, like here, there is no reasonable expectation of privacy.

## III. Conclusion

Finding no error in the district court's reliance on our opinion in *Jackson*, we **AFFIRM** its judgment.

ENTERED FOR THE COURT

Timothy M. Tymkovich
Chief Judge