WISCONSIN CENTRAL LTD, Plaintiff-Appellant,

v.

Mark GOTTLIEB, Secretary,
Wisconsin Department of Transportation,
Defendant-Respondent.

Court of Appeals

*No. 2012AP1019. Oral argument March 19, 2013.*
*—Decided April 24, 2013.*

2013 WI App 61

(Also reported in 832 N.W.2d 359.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Russell W. Wilson* and *Terri M. Smith* of *Ruder Ware, L.L.S.C.* of Wausau. There was oral argument by *Russell W. Wilson*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Chad R. Gendreau*, assistant attorney general, *R. Duane Harlow*, assistant attorney general, and *J.B. Van Hollen*, attorney general. There was oral argument by *Chad R. Gendreau*.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. BROWN, C.J. This case concerns a troublesome railroad crossing where busy railroad tracks owned by Wisconsin Central LTD (WCL) intersect with high volume vehicle traffic on Lakeshore Drive leading into and out of the city of Fond du Lac. Pursuant to an order of the Office of the Commissioner of Railroads (OCR), the Wisconsin Department of Transportation (DOT) is managing a project through which vehicle traffic on Lakeshore Drive will be redirected onto an overpass, separated from the railroad tracks. The overpass project was the outcome of a settlement agreement between WCL and the village of North Fond du Lac, approved by the OCR. The OCR, pursuant to that settlement, authorized the village to seek funding and move forward with construction of the overpass. The DOT is in charge of the project and seeks soil samples from portions of WCL's property that are in the project construction corridor, as part of the environmental due diligence that is required by state and federal regulations before the project can move from the design phase to the construction phase.

¶ 2. WCL objects to the DOT's taking the soil samples, arguing that such action would amount to an unreasonable search and seizure of its property in

violation of the Fourth Amendment. It sued the DOT to stop it from taking such samples, and now appeals from a judgment of the Fond du Lac county circuit court denying its motion for an injunction and dismissing its action seeking declaratory and injunctive relief. We hold that WCL expressly consented to the overpass project, including, specifically, the soil sampling required to complete the design phase. We affirm.

*Background*

¶ 3. The intersection of WCL's railroad with Lakeshore Drive in North Fond du Lac is causing traffic and safety problems for the community. WCL's records as of 2007 showed that the crossing was blocked by rail traffic for at least 5.75 hours per day. In proceedings concerning the crossing, the OCR found that the blocked traffic causes "enormous public inconvenience in delays" and increased costs of travel and forces public safety agencies to use other routes, which "more than double[s] response time" in some emergencies. Hence, it is beyond dispute that, as the OCR concluded, "[c]hanging the existing [crossing] . . . will promote public safety and convenience."

¶ 4. Formal proceedings concerning the crossing were initiated in 2005 when WCL petitioned the OCR to close or alter the crossing, as provided by WIS. STAT. §§ 195.28 and 195.29 (2011–12).[1] *See In re* Petition No. 9164–RX-611, PSC Ref. #178625, 1 (Nov. 3, 2005) (interim order). After initial proceedings, WCL withdrew its request to close the crossing and revised its petition to alter the crossing. *Id.* In addition, the village added its own petition to the proceedings, seeking an

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

order that there should be a grade separation at the crossing—i.e., that the railroad tracks and the roadway should be separated, with one going over the other. *Id.*

¶ 5. Faced with these petitions, the OCR first issued an interim order granting WCL's revised petition to alter the tracks and ordering the following:

> the **WCL to fund 50% of the cost of a study to evaluate the feasibility of constructing a grade-separated crossing** at or near the Lake Shore Drive crossing, **provided** that the **Village Board of North Fond du Lac** passes a resolution . . . authorizing Village staff to commence such a study whether with its own personnel, through the Wisconsin Department of Transportation, through the Regional Planning Commission or through some other entity or mechanism.

*Id.* at 2 (alteration in original). Nothing in the record suggests that either WCL or the village objected to or sought review of this order, and the study was completed in 2007.

¶ 6. The study cofunded by the village and WCL presented five alternatives for a grade separation at the crossing. The village and WCL both agreed that one design, Alternative B, was the best, as it "has the lowest estimated cost," provides desirable grades for approach, and needs relatively "modest" real estate acquisition. The commissioned study also set forth the following "environmental" information applicable to any of the designs for separating the grades at the crossing:

> This report did not investigate the potential for underground contamination of lands required for the alternative projects. A[t] least one site on railroad property is known to have been identified in the past and remediated. Because of the age of the yard and the

> nature of operations in rail yards, any project alternative selected for further development should include a HAZMAT investigation for the selected route. The HAZMAT investigation should be performed by qualified individuals and may require field sampling of soils and laboratory testing.

The report also reviewed "possible funding sources," including details about three DOT-managed programs.

¶ 7. In January 2007, shortly after the study was issued, the village and WCL executed a proposed settlement agreement documenting their agreement to share costs of constructing the overpass as described in Alternative B of the study. In this agreement, the village promised to seek "a Federal earmark for a grant" and WCL promised to pay the village $800,000 if it was able to secure the needed funds. The agreement also provided that "[e]ach party will be fully compensated by the other for the fair market value of property taken by the other for purposes of the project."

¶ 8. In April 2007, the OCR issued its final decision resolving the petitions concerning the intersection. *In re* Petition No. 9164–RX-611, PSC Ref. No. 178623, 1–2 (April 2, 2007) (final decision). The final decision approved of the proposed settlement agreement and expressly found that "[t]he Village and railroad agreed on the same alternative" for the overpass. The OCR also expressly authorized the village "to construct a grade-separated crossing (consistent with Alternative B as set forth in Exhibit 1) of Lakeshore Drive" and "[t]hat the cost of the crossing construction shall be apportioned according to" the settlement agreement, which was attached as Exhibit 4 to the order and "incorporated . . . by reference."

¶ 9. The study that served as the basis of the final decision approving construction "consistent with Alter-

native B," also discussed "possible funding sources," most of which were programs managed by the DOT. In particular, the study pointed out the federal "earmark" funds that the village ultimately promised to pursue in its settlement with WCL necessarily required that the DOT would "bid out" the construction project. Specifically, the study explained,

> If an attempt is made to obtain earmark funds for the . . . project, the Village must work with Federal legislators to pursue this funding source. In addition, the community will need to partner with WisDOT in making design decisions, and the construction work would be bid out as a WisDOT contract.

That is precisely what happened. At some time after the final decision was issued, the DOT began handling the project.

¶ 10. The DOT handles highway construction projects via planning, design, construction, and maintenance stages. The overpass project at the crossing has been in the design phase throughout the proceedings in this case. The design phase precedes construction. In the design phase, inspections are done to determine "field conditions out there, what residences may be impacted, environmental concerns, things of that nature." Geotechnical inspections examine the subsurface to tell if its properties will support the planned construction. Environmental inspections ensure that contamination is minimized or avoided. In addition, the DOT is required by federal and state regulations to conduct and document its environmental review during the design stage. *See* WIS. ADMIN. CODE § TRANS 400.06(5); *see generally* WIS. ADMIN. CODE ch. 400 and 23 C.F.R. pt. 771 (2012).

¶ 11. The DOT moved forward with the planning and design of the overpass project as outlined in Alternative B and authorized by the OCR's final decision. In 2010, the DOT conducted geotechnical inspections, including taking soil borings, some of which were taken from WCL's property. Before removing those samples, the DOT gave WCL notice of its plans to take the soil, and received no objections from WCL.

¶ 12. Also as part of the design phase, a consultant prepared a Phase 1 Hazardous Materials Assessment concerning the project. That assessment concluded that further hazardous materials investigations needed to be done at various sites in the construction corridor. Specifically, the investigation discovered three sites that were "directly adjacent to the project corridor," one of which is on WCL's property. Therefore, the Phase 1 investigation recommended "further hazardous materials" investigation for a number of sites, including an area of concern on WCL's property.

¶ 13. After receiving that report, the DOT sent notice to WCL that it intended to enter its property to take the soil samples as was recommended by the consultant. WCL objected and refused to give its consent to environmental sampling. Despite WCL's objection, the DOT went ahead and took certain samples. Soon thereafter, WCL filed the lawsuit that is now on appeal. Testimony before the circuit court established that the construction of the overpass cannot move forward until the hazardous material investigation is completed.

*Analysis*

¶ 14. WCL asserts that the DOT lacks the authority to take the soil samples, that the DOT's taking the

samples without a warrant violates WCL's Fourth Amendment rights, and that the DOT has no right to a warrant because it lacks probable cause. The DOT has responded that it has the statutory authority to take the samples under Wis. Stat. § 84.01(10). Upon our request, the parties provided supplemental briefing concerning the applicability of the "special needs" exception to the warrant requirement. *See, e.g., Lundeen v. DATCP*, 189 Wis. 2d 255, 525 N.W.2d 758 (Ct. App. 1994). We further asked the parties to discuss the impact, if any, of the HAZMAT inspection referred to in the cofunded study.

¶ 15. After oral argument and our review of the record in this appeal, we are convinced that there is no need to decide whether the warrant requirement applies to this dispute, whether the special needs doctrine makes a warrant unnecessary, or whether Wis. Stat. § 84.01(10) authorizes the DOT's search power here. For purposes of our analysis, we simply assume without deciding that the warrant requirement applies.

¶ 16. Even where a warrant requirement applies, however, consent to a search or seizure makes a warrantless search reasonable:

> The Fourth Amendment to the United States Constitution does not prohibit all state-initiated searches, but only those that are unreasonable. Warrantless searches are per se unreasonable. A warrantless search conducted pursuant to voluntary consent, however, is one of the well-established exceptions to the warrant requirement. Whether a law enforcement officer was given consent to search and whether subsequent words or actions limited the scope of that consent are questions of fact we review for clear error. However, the ultimate question of whether a search was reasonable,

> and therefore lawful under the Fourth Amendment, is a question of law we review de novo.

*State v. Wantland*, 2013 WI App 36, ¶ 95, 346 Wis. 2d 680, 828 N.W.2d 885. In view of facts established in the OCR proceedings in Petition No. 9164–RX-611, we are convinced that WCL consented to the overpass project, including the environmental sampling that is required to move the project forward through the design phase and on to construction.

¶ 17. Railroad operations—their construction, alteration, maintenance, and daily operations—are heavily regulated by state and federal statutes and administrative codes. *See, e.g.*, WIS. STAT. chs. 190–92, 195, and *Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602 (1989). WCL's ability to close or alter its tracks where they cross public roadways is governed by state statutes, *see* WIS. STAT. §§ 195.28 and 195.29. WCL followed that law when it wanted to close or alter the crossing at Lakeshore Drive in North Fond du Lac, by initially petitioning the OCR in Petition No. 9164–RX-611. While WCL voluntarily withdrew its petition to close the crossing, it also voluntarily complied with the OCR's order that it cofund (with the village) a study to develop a plan to change the crossing. And it was that study, done on behalf of the village *and* WCL, which expressly provided that "any project alternative selected for further development should include a HAZMAT investigation for the selected route," and that such investigation "may require field sampling of soils and laboratory testing." Thus, when the OCR ultimately approved of the parties' settlement and authorized the village to construct the crossing "consistent with Alternative B as set forth in Exhibit 1," it was also ordering that environmental due diligence would have to take place *as set forth* in the study.

¶ 18. At oral argument, WCL attempted to distance itself from the study, asserting that it "was ordered" to cofund the study and that the OCR "compel[ed]" it to comply. We find no record, however, of any objection whatsoever by WCL concerning the OCR's interim order or final decision. To the contrary, after the interim order was issued and the study was completed, WCL voluntarily entered into the settlement agreement, by which it bargained for the village to seek federal funding for the overpass construction. And WCL made no objection to the OCR's express factual finding that both WCL and the village "agreed on the same alternative," namely, Alternative B.

¶ 19. If WCL wished to raise objections to the OCR's decision or orders concerning the petitions in Petition No. 9164–RX-611, the proper procedure, of course, would have been to raise those objections with the OCR itself in the initial hearing or a request for rehearing, and to seek judicial or appellate review if necessary. *See, e.g.,* WIS. STAT. §§ 227.49, 227.52, 227.58. It could not sit on its hands as the village and the DOT sought and spent taxpayer funds in reliance upon WCL's inducement to move forward with the overpass project, and then raise its hidden objections when the design phase neared completion.

¶ 20. We also reject WCL's assertion that the DOT's involvement in the overpass project and, in particular, its involvement in the environmental sampling of the railroad's property is "anomalous." WCL vehemently argues that the DOT is an agency it "does not answer" to and "is not regulated by." But while WCL is correct as far as it goes—it is true that the DOT is not the state agency with regulatory authority over railroads—WCL's argument ignores the fact that the DOT's area of authority, the highway system, quite literally intersects with railroads on occasion.

¶ 21. In fact, both state and federal regulations expressly direct how the DOT is to proceed in situations involving railroads. *See, e.g.,* WIS. ADMIN. CODE TRANS ch. 30 (program of loans for relocation of railroads and public utilities); WIS. ADMIN. CODE § TRANS 400.08(1)(a)3. and (1)(c)1.c. In particular, as WCL itself pointed out at oral argument, the DOT regulations requiring the DOT to perform environmental due diligence in this project in large part mirror federal regulations that specify in minute detail exactly what sort of environmental due diligence must be done for a myriad of transportation projects.

¶ 22. As WCL admitted at oral argument, "grade separation to replace existing at-grade railroad crossings" projects are described in federal transportation regulations as often appropriate for categorical exclusion from environmental concerns, but only if there is "documentation which demonstrates that the specific conditions or criteria for these [categorical exclusions] are satisfied and that significant environmental effects will not result." 23 C.F.R. § 771.117(d)(3) (2012). In turn, state transportation regulations provide that if the DOT is involved in railroad crossing grade separations, it must prepare an environmental report to show whether the particular project is appropriate for this categorical exclusion from environmental considerations under federal and state law. WIS. ADMIN. CODE § TRANS 400.08(1)(c)1.c.

¶ 23. Hence, in this particular situation into which the village and WCL have invited the DOT, accomplishing a grade separation of a highway-railroad crossing, the DOT has specific, express regulatory duties and authority, under both state and federal law.

¶ 24. Thus, WCL's situation in the overpass project is nothing like that of the suspected narcotics

criminal in *United States v. Jones*, 132 S. Ct. 945 (2012), the case that WCL urges us to apply here. In *Jones*, law enforcement placed a GPS tracker on the suspect's car without his knowledge, let alone his consent. *Id.* at 948. Here, in contrast, the agency that was identified in WCL's own study as the likely manager of construction on this overpass project, the DOT, seeks soil samples that are necessary to complete the HAZMAT inspection required by that same study and legally required to complete the design phase of the overpass project that resolved the OCR proceedings. What is more, WCL, in its settlement agreement, bargained for the village's promise to seek federal "earmark" funds in particular, and (as the study plainly stated) getting earmark funds necessitated the DOT's involvement. These facts share no similarities with *Jones*.

¶ 25. We conclude that no issue of unreasonable search or seizure is raised by the DOT conducting soil sampling and laboratory testing of soil in the area of WCL's property that is located in the overpass project construction corridor. WCL consented to this limited sampling, a necessary component of the design phase of the overpass project, expressly described in the study that led WCL and the village to agree upon Alternative B, an agreement that was expressly approved by the OCR in its resolution of the public safety and traffic concerns at the crossing. When it was the voluntary agreement of WCL and the village to move forward with the overpass project that led the DOT to require the samples, WCL cannot now complain that this limited sampling, necessary to complete the design phase of the project, violates its property or constitutional rights.

*By the Court.*—Judgment affirmed.